UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CARMINE FEDERICO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 15-12360-FDS |
| | ) | |
| TOWN OF ROWLEY and | ) | |
| MARYBETH WISER, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an employment dispute. Plaintiff Carmine Federico has brought this action against the Town of Rowley, his former employer, and MaryBeth Wiser, his former supervisor.

The complaint alleges five claims against both defendants. The first four claims are brought pursuant to the federal Family and Medical Leave Act, 29 U.S.C. § 2615(a), and the Massachusetts Small Necessities Leave Act, Mass. Gen. Laws ch. 149, § 52D, related to time that Federico took off work. Federico contends that defendants interfered with his right to take leave under these laws, and that they subsequently terminated him in retaliation for exercising his right to take leave. The fifth claim is for invasion of privacy under Massachusetts law. Federico contends that Wiser searched his personal effects without permission during his employment.

Defendants have moved for summary judgment as to all claims. For the following reasons, the motion will be granted.

I.      **Factual Background**

The facts are presented in the light most favorable to the plaintiff, except where otherwise noted.

Carmine Federico began working as the administrative assistant to the superintendent of the Rowley Water Department on September 23, 2013. (Federico Dep. 47). As an administrative assistant, Federico was responsible for providing administrative support to the superintendent, including answering the telephone, scheduling appointments, and preparing minutes for bi-monthly Board of Water Commissioners meetings. (Def. Ex. D 3-4). For nearly a year, Federico held that position without incident. (Federico Dep. 67-68).

On August 11, 2014, MaryBeth Wiser joined the Rowley Water Department as the new superintendent, and became Federico's direct supervisor. (*Id.* at 65). Wiser and Federico agree that for the first few weeks of her tenure, the two enjoyed a "friendly" and professional relationship. (*Id.* at 67-68; Wiser Dep. 39-40).

A.      **Federico's Leave on September 2, 2014**

On Tuesday, September 2, 2014, Federico took the day off work in order to care for his elderly mother. (Federico Dep. 77).[1] At that point, Federico had not worked for the Town for one year, and therefore did not have any right to FMLA-protected leave.

That morning, nine inmates from the Lawrence jail arrived at the Rowley Water Department to perform painting work as part of an ongoing work-release program. (*Id.* at 88; Wiser Dep. 42-43). The inmates could not be put to work immediately because the Water Department lacked the necessary supplies. (Wiser Dep. 42-44). The Town contends that it was Federico's responsibility to prepare for and direct the inmates' work, and that he knew or should

---

[1] September 2 was the day after Labor Day. Federico did not take his mother to any medical appointments that day; instead, he helped her out around the house. (Federico Dep. 87).

have known that the inmates would arrive on September 2.  Federico, however, disputes that contention.  (*Id.* at 42-44; Federico Dep. 89-90).

Wiser called Federico once or twice over the course of the day and sent him one or two text messages concerning the waiting inmates.  (Federico Dep. 93-94).[2]  According to Federico, Wiser's messages were difficult to understand due to a bad connection, but from what Federico could understand, Wiser sounded "very overwhelmed," "distraught and lost," and "irate about something."  (*Id.* at 94).  Federico contends that he returned Wiser's calls, but couldn't get through.  (*Id.*).  Failing to get in touch with Federico, Wiser went to Walmart to get the missing supplies.  (Wiser Dep. 44).

B.     **The Events of September 9 to 23, 2014**

Federico contends that after that day, Wiser's attitude toward him changed, becoming hostile and condescending.  (Federico Dep. 100, 108).  He contends that Wiser asked him to perform personal and demeaning tasks, such as cleaning dog feces and cigarette ashes from her car.  (*Id.* at 100).  Wiser denies that her attitude and disposition toward Federico changed after September 3, and denies that she asked Federico to perform personal favors for her.  (Wiser Dep. 51-52).

On September 9 or 10, 2014, Wiser met with Federico after she "had noticed that [his] job performance was poor."  (*Id.* at 100).  After the meeting, Wiser sent Federico a memorandum

---

[2] There are material inconsistencies between Federico's deposition testimony and his affidavit as to that issue.  In his deposition, Federico testified that Wiser called one or two times and texted one or two times.  (Federico Dep. 93-94).  He repeatedly testified that he could not recall the substance of any of his conversations with Wiser, if there were any, and that he could not recall the substance of text messages.  (*Id.*)  When asked whether Wiser left a message, he stated, "I don't recall.  It's been a while so I don't recall, but I know there was some type of communication going on."  (*Id.* at 96).  When asked "Did you ever text her that day?" he responded, "No, I don't think so, not to my knowledge."  (*Id.* at 94).  In contrast, Federico's affidavit states that "Ms. Wiser repeatedly called, texted and left voice mail messages for me and ignored my responses that I needed to tend to my mother."  (Federico Aff. ¶ 8).  For the reasons set forth in a separate memorandum and order, the relevant portion in the affidavit will be struck.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

to follow up on the meeting and to spell out his duties and responsibilities in detail. (Def. Ex. D). The memorandum, among other things, directed Federico to limit personal telephone calls during work hours, to refrain from taking work home, and to prepare minutes the day after each Board of Water Commissioners meeting is held. (*Id.* ¶¶ 17, 26, 2, 19).

By Friday, September 19, Federico had not yet completed six sets of minutes. (Wiser Dep. 73). That day, Wiser instructed Federico to put all other work aside and complete the missing minutes by September 23. (Def. Ex. E). That timeline would allow Federico to work on the minutes all day on September 22. (*Id.*). Wiser also instructed Federico not to take work home. (*Id.*). Federico failed to produce the missing minutes by Wiser's deadline, and continued to take work home despite Wiser's directive. (Federico Dep. 235)

On Monday, September 22, Federico arrived at work around 7:00 a.m., dropped his briefcase on his desk, and briefly left the office to use the men's room and punch in. (Federico Dep. 23). His briefcase contained notes he had prepared for meeting minutes, prescription medications, his notary public seal, and his wallet. (*Id.* at 15-21). The parties dispute what happened next. Federico contends that he returned to find his briefcase in disarray, and concluded that Wiser must have rummaged through his papers while he was away from his desk. (*Id.* at 17-18). Wiser contends that she did not examine the contents of the briefcase, but instead took photographs of work-related papers visible in the open bag. (Wiser Dep. 89-91).

On Tuesday, September 23, Wiser held a meeting at the Water Department office with Federico, Ron Keefe, the union representative, and Amy Lydon, the Assistant Town Administrator, to discuss Federico's job performance. (Def. SMF ¶ 46). The attendees discussed the status of the incomplete Board minutes, the manner in which Federico took telephone messages, and the charge that Federico was taking work home with him. (Wiser Dep.

4

98). When discussing the prohibition on working from home, Wiser stated that she had seen work papers in Federico's briefcase and that she had taken photographs of the papers. (Federico Dep. 17). Wiser held up her cellular telephone which contained the photographs, but did not show them to anyone at the meeting. (*Id.* at 21-22; Def. SMF ¶ 51; Pl. Resp. to Def. SMF ¶ 51).

At about 11:45 a.m., Wiser asked Federico to produce the minutes that he had completed to that point. (Def. SMF ¶ 54). Federico did not produce anything. Instead, he stated that he thought someone must have deleted the drafts. (*Id.* ¶ 55). At approximately 11:45 a.m., he stated that he was going home sick and that he had recorded the meeting with his cellular telephone. (*Id.* ¶¶ 54-55). Federico then left the office.

Federico never returned to work at the Water Department. (*Id.* ¶ 56). As of September 23, 2014, he had worked at the Water Department for exactly one year. He thus became eligible for FMLA-protected leave on the day he left.

      C.      **Post-Employment Investigation of Federico's Internet Use**

On September 24, 2014, Water Department staff reviewed Federico's work computer and collected internet browsing history and e-mails sent to and from Federico's work e-mail. (Summit Dep. 10-11). The Town contends that the initial reason for investigating Federico's computer after his departure was to try to find the missing Board minutes. (Eagan Dep. 28).

The browsing history on Federico's computer revealed that he had spent an enormous amount of time at work viewing websites, bulletin boards, and videos, and sending e-mails that were not work-related. Among other things, he viewed thousands of advertisements for escort services and other sexually explicit advertisements and websites. (Def. Ex. I; Federico Dep. 94). He also watched dozens of hours of episodes of the television show *Hogan's Heroes* during work hours. (Def. Ex. I).

The paper printout of Federico's Internet browsing history for the three-month period between June 26 and September 22, 2014, takes up 642 pages of single-spaced text. (Ex. I). A few examples will illustrate how he spent most of each work day.

As noted, on September 9 or 10, Wiser met with Federico after noticing that his work performance was poor. On the previous day, September 8, Federico first accessed the internet at 7:00 a.m. by logging on to "Free Music Online – Internet Radio – Jango." (Ex. I-10 at 971). He then spent half an hour logging on to what appears to be private e-mail accounts at Hotmail.com and Yahoo.com. (*Id.* at 971-72). At 7:29 a.m., he began looking at advertisements on Craigslist.com and Backpage.com.[3] At 7:30 a.m., he began to view explicit advertisements for casual sexual encounters. (*Id.* at 972). He continued to look at ads for sexual encounters, websites, and his personal e-mail almost continuously until 11:50 a.m. (*Id.* at 987).[4] The records of his Internet activity for that morning alone—from 7:30 a.m. to 11:50 a.m.—take up more than 17 single-spaced pages of the record. (*Id.* at 972-87). At 12:15 p.m., he opened an episode of *Hogan's Heroes* on YouTube, and presumably began watching it at his desk. There was no Internet activity for the next two hours. At 2:37 p.m., he resumed looking at ads for casual sexual encounters and his personal e-mail accounts. (*Id.* at 987). At 3:24 p.m., the Internet activity ended. (*Id.* at 991). The internet history for the 47-minute period between 2:37 p.m. and 3:24 p.m. is more than four pages long. (*Id.* at 987-91).

As also noted, on Friday, September 19, Wiser instructed Federico to put all other work aside in order to complete the missing Board minutes. The internet records for the previous day,

---

[3] Backpage.com is a website that publishes classified advertisements for local escort services, among other things. *See, e.g., Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016).

[4] The advertisements included such titles as "Methuen slut," "Daddy, where are you?," "Slim young beauty catering to your needs," and "Cute discreet white woman looking for a hookup." (*Id.* at 972-87).

September 18, are of a similar nature to those described above. (*Id.* at 1021-23). Although he viewed fewer sexual encounter advertisements that day, he streamed seven separate episodes of *Hogan's Heroes*. (*Id.*). On September 19, there were no searches of ads for sexual encounters, but he did watch one episode of *Hogan's Heroes*. (*Id.* at 1024). September 20 and 21 were a Saturday and Sunday, respectively, and there was no Internet activity that day.

On Monday, September 22, 2014—the day of the alleged briefcase search, and the day he was supposed to be finishing the six sets of minutes—Federico began using the internet from his work computer at 7:07 a.m., seven minutes into the workday. (Def. Ex. I-10). At 7:07, he opened three websites simultaneously: one for an episode of *Hogan's Heroes* on YouTube, one entitled "Free Music Online," and one entitled "Water Commissioners' Meeting recorded July 15 - Rowley Community Media." (*Id.* at 1024). At 7:28 a.m., Federico opened Backpage.com. (*Id.* at 1025). While on the Backpage website, he visited advertisements for escorts with titles such as "NOTHING *SWEET* LIKE PETITE (new pics!)" and "Fresh meat in town YOUNG_FUN_SPONTANEOUS." (*Id.*). At 7:50 a.m., he opened a new episode of *Hogan's Heroes*. (*Id.* at 1025). He opened three additional episodes at 8:24 a.m., 8:52 a.m., and 9:45 a.m. (*Id.*). At 9:56 a.m., he visited the "Casual Encounters" section of Craigslist.com. (*Id.*). Between 9:56 a.m. and 10:06 a.m., he viewed eight more sexually explicit advertisements on Casual Encounters and Backpage, with titles such as "cuddle or whatever 'w4m,'" "looking to feel used - w4m," and "1 in a million hottest Latinas passion available now." (*Id.* at 1025-26).[5] At 10:13 a.m., he began watching another episode of *Hogan's Heroes*, followed by another—his seventh of the day—at 10:42 a.m. (*Id.* at 1026). At 10:55 a.m., he returned to Craigslist to view

---

[5] The abbreviation "w4m" stands for "women seeking men." *United States v. Hinkel*, 837 F.3d 111, 115 (1st Cir. 2016).

additional sexual services advertisements. (*Id.* at 1026-27). At 10:56 a.m., he visited a website entitled "Job Listings in Massachusetts." (*Id.* at 1027). At 11:23 a.m., he began watching an eighth episode of *Hogan's Heroes*. (*Id.*). He streamed two additional episodes at 11:50 a.m. and at 1:35 p.m. (*Id.*). Thus, on September 22 alone, Federico watched a total of ten episodes of *Hogan's Heroes* during work hours. (Def. Ex. I-10).

In addition to his internet activity, Federico also spent extensive time at work chatting by e-mail with a woman with whom he was having an extramarital affair. (Def. Ex. G 23-25, H). Among other things, in an e-mail sent on Friday, September 19, he referred to Wiser as a "crazy women [*sic*]." (Def. Ex. H 19). The same day, he wrote that "THIS CUNT [Wiser] HERE IS PISSING ME OFF." (Def. Ex. H 16).

The search of Federico's work e-mail also revealed that on February 3, 2014, he sent an e-mail from his work e-mail address to his personal e-mail address that contained a link to what is apparently an advertisement for sexual services, with a sexually explicit subject line. (Def. Ex. S).[6] That e-mail was sent in contravention of the Town's e-mail policy, which states that "[e]lectronic mail should never be used to create offensive . . . messages . . . . Among those things which are considered offensive are any messages . . . which contain sexual implications . . . ." (Def. SMF ¶ 76).

After reviewing the computer records, the Water Department contacted the Rowley Police Department. (Eagan Aff. ¶ 4). On September 26, 2014, the Police Department began an investigation to determine whether Federico had solicited sexual services for a fee in violation of Mass. Gen. Laws ch. 272, § 53A while at work. (Pl. Ex. 3 at 2). The detective assigned to the case, Matthew Ziev, reviewed calls sent and received from Federico's town-issued cellular

---

[6] The subject line of the e-mail was "{{{***HORNY PUSSY NEED FUCK*** }}} - w4m." (Def. Ex. S).

8

telephone, and e-mails sent and received from his work and personal e-mail addresses. (Def. SMF ¶¶ 69, 71). Detective Ziev found evidence that Federico had sent and received messages from sexual service providers using his personal e-mail during work hours, and made and received calls from such services using his town-issued cellular telephone. (Pl. Ex. 3 3-9).[7] Ultimately, however, Detective Ziev determined that there was no probable cause to file a criminal complaint against Federico. (*Id.* at 8-9).

### D.     Plaintiff's Application for FMLA Leave

Federico contends that after leaving the Water Department, he began suffering from anxiety, depression, and panic attacks that caused his body temperature to fluctuate. (Federico Dep. 154-56). On October 6, 2014, Federico's wife called Doreen Glowik, the Rowley Assistant Town Administrator, and requested materials for her husband to apply for leave under the Family and Medical Leave Act. (Def. SMF ¶ 81). The same day, Glowik sent a letter to Federico's wife that contained the FMLA application form and other materials necessary for applying. (Def. SMF ¶¶ 81, 89). Federico—who was familiar with the process of applying for FMLA leave because of his prior employment in human resources at the Massachusetts Department of Transportation and because he had filed a lawsuit against that agency after he was terminated in which he alleged claims for FMLA interference and retaliation—testified that the Town provided him with all the paperwork necessary to apply for FMLA leave. (Federico Dep. ¶ 154, 179-80; Def. Ex. X Complaint and Jury Claim, *Carmine Federico v. the Commonwealth of Massachusetts*, C.A. No. 1:07-CV-11981-PBS ¶¶87-93).[8]

---

[7] Plaintiff objects to the admission of the police report on the basis that it is hearsay. That report, however, is likely a public record under Fed. R. Evid. 803(8). Even if it were hearsay, it could be considered for purposes other than the truth of the matter asserted (for example, that the Water Department was told the information contained in the report). Furthermore, and in any event, plaintiff himself submitted the exhibit.

[8] Plaintiff has moved to strike this fact from the record as irrelevant. However, Federico bases his claim, at least in part, on the fact that "Ms. Wiser made no attempt to inform [him] of [his] rights pursuant to the Family

On October 22, 2014, the Town received completed copies of Federico's FMLA application materials and supporting medical documentation. (Def. SMF ¶ 90). On October 27, 2014, the Rowley Town Administrator notified Federico that his request for FMLA leave had been approved, effective retroactively to September 23, 2014. (*Id.* ¶ 92).

Federico took twelve weeks of FMLA leave, up to December 16, 2014. According to him, his health condition prevented him from returning to work. (Federico Dep. 181). On February 13, 2015, the Town extended an additional period of unpaid leave to Federico through February 20, 2015. (Def. Ex. AA). It is not clear from the record whether that additional leave was made retroactive to December 16, 2014.

### E.  Federico's Termination

On February 26, 2015, Deborah Eagan, the Town Administrator, sent Federico a letter directing him to attend an investigatory interview. (Def. Ex. BB). Federico failed to attend the interview, although his attorney did. (Eagan Aff. ¶¶ 20-21). On March 9, 2015, Eagan sent another letter to Federico directing him to attend an additional investigatory interview scheduled for March 16, 2015. (Def. Ex. DD). Federico again failed to attend the interview, and again his attorney attended. (Eagan Aff. ¶¶ 20-21).

On May 19, 2015, the Town Board of Selectmen and Board of Water Commissioners held a joint meeting to discuss allegations of misconduct against Federico. (Def. SMF ¶ 105). The Boards held another meeting on June 2, 2015, to continue the discussion. (*Id.*). On June 2, 2015, the Boards voted that the charges of misconduct against Federico were sustained, and voted to terminate his employment. (*Id.* ¶ 109).

On June 3, 2015, the Town sent Federico a letter notifying him of the termination of his

---

Medical Leave Act." (Federico Aff. ¶26). His former employment and his status as a repeat FMLA plaintiff are relevant to the issue of whether Wiser had to inform him of his FMLA rights, and will not be struck.

employment. (Def. Ex. FF). The letter stated that Federico was being terminated for the following reasons:

- Neglect of duty – Failing to generate certain minutes of the Water Commission's meetings as directed by your supervisor and engaging in excessive non-work activities during work hours such as watching episodes of Hogan's Heroes on YouTube, engaging in other non-work related computer activity and making/receiving numerous extended personal telephone calls;

- Conduct unbecoming an employee – utilizing the Town's computer system to view websites offering illicit and other sexual services and using the Town's computer system and Town issued cell phone to respond to and communicate with some of the individuals who advertised their services on such sites; and

- Insubordination – Failing and refusing to comply with the Town Administrator's directives to attend investigatory interviews that were scheduled to discuss the allegations above on two separate occasions.

(*Id.*).

## II.  Procedural Background

On April 17, 2015, Federico filed this lawsuit in Essex Superior Court. The complaint alleged five claims against both defendants for (1) interference with plaintiff's rights under the federal Family and Medical Leave Act; (2) retaliation under the federal Family and Medical Leave Act; (3) interference with plaintiff's rights under the Massachusetts Small Necessities Leave Act; (4) retaliation under the Massachusetts Small Necessities Leave Act; and (5) invasion of privacy.

On June 17, 2015, defendants removed the action to this court. Defendants have now moved for summary judgment as to all five claims.

## III.  Analysis

### A.  Motion for Summary Judgment

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

> 1. **Counts One and Two: Family and Medical Leave Act Claims**

The federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, provides employees with certain rights to take medical leave and other personal leave. *See Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159-60 (1st Cir. 1998). Plaintiff claims two separate violations of the FMLA by both defendants: an "interference" claim and a "retaliation" claim. Both claims are brought under 29 U.S.C. § 2615(a), which makes it unlawful for any employer to "interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under [the FMLA]." Although the language of the statute is not explicit with respect to retaliation, employers are "prohibited from discriminating against employees . . . who have used FMLA

leave." *Hodgens*, 144 F.3d at 160 n. 4 (quoting 29 C.F.R. § 825.220(c)).

### a. **Interference**

Plaintiff contends that he was entitled to leave under the FMLA after he left work on September 23, 2014, and that defendants interfered with that right. In order to establish a *prima facie* case for FMLA interference, a plaintiff must show that (1) he was eligible for the protection of FMLA; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *See Carrero-Ojeda v. Autoridad de Energía Eléctrica,* 755 F.3d 711, 722 n. 8 (1st Cir. 2014).

Plaintiff's claim for interference fails because he has not produced evidence that he was denied any FMLA benefits to which he was entitled. To the contrary, he testified that he received all materials necessary to apply for FMLA leave, and acknowledges that he was granted leave on October 27, which was provided retroactively, effective on September 23. When, at the end of the twelve weeks of leave to which he was entitled under FMLA, he felt that he was still unable to return to work, he received an additional period of unpaid leave. He has not provided any evidence to support his claim that defendants interfered with his rights under the FMLA. Defendants' motion for summary judgment as to Count One will therefore be granted.

### b. **Retaliation**

Plaintiff further contends that he was terminated in retaliation for exercising his rights under the FMLA. A *prima facie* case of FMLA retaliation requires a plaintiff to prove that (1) he availed himself of a protected FMLA right; (2) he was "adversely affected by an employment decision;" and (3) "there was a causal connection between [his] protected conduct and the adverse employment action." *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.,* 447

13

F.3d 105, 113-14 (1st Cir. 2006).  A key difference in required proof between an interference claim and a retaliation claim is causation:  a retaliation claim requires an allegation (and, ultimately, proof) of a retaliatory motive on the part of the employer, but motive is generally irrelevant to an interference claim.  *See Hodgens*, 144 F.3d at 159-60.

Where, as here, there is no direct evidence of retaliation, the court must employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 335 (1st Cir. 2005).  Under that framework, the plaintiff must first establish a *prima facie* case of unlawful retaliation.  *Id* at 336*.*  Once the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id*.  If the employer articulates such a reason, the burden shifts back to the employee to show that the employer's stated reason for the adverse action was in fact a pretext for retaliation.  *Id.*

Here, it is undisputed that plaintiff has established the first two prongs of the test for a *prima facie* case—namely, that he availed himself of a FMLA right when he applied for leave in October 2014, which was granted, and that he suffered an adverse employment action when he was terminated in June 2015.  The question is whether there is a genuine issue of material fact as to whether plaintiff's exercise of his FMLA rights caused his termination.

In general, a plaintiff's burden to show that an adverse employment action occurred because of the exercise of FMLA rights is "quite easy to meet." *Id.* at 165-66 (quoting *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.1991)).  Here, plaintiff relies on two pieces of evidence in support of his claim.

First, he contends that Wiser's attitude toward him changed after he took the day off of work to care for his mother on September 2.  To qualify for FMLA leave, an employee must

have been employed for at least twelve months. 29 U.S.C § 2611(2)(A)(i). Plaintiff began working at the Rowley Water Department on September 23, 2013. Exactly twelve months later, on September 23, 2014, he left work, only later asserting his right to take leave under the FMLA. His ability to take leave on September 2 was not protected by the FMLA, because he was ineligible for the protection of the statute at that time. As a result, Wiser's alleged change in attitude the next day cannot constitute retaliation for the exercise of a protected right. Plaintiff, however, contends that her changed attitude is evidence of an intent to retaliate against him for taking leave once he was eligible for such leave.

Second, plaintiff contends that the fact that his termination followed immediately after he took leave under the FMLA demonstrates retaliatory intent. He left work on September 23, 2014, and the Water Department began investigating his internet use the following day. That investigation began a chain of events that ultimately led to his termination.

Based on those two pieces of evidence, plaintiff has—just barely—established a *prima facie* case for retaliation. *See Sanchez-Rodriguez v. AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012) (finding that evidence of "temporal proximity" between employee's action and the allegedly retaliatory adverse employment action helps establish causation prong); *Calero-Cerezo,* 355 F.3d at 25 (finding that "sufficient temporal proximity between the protected conduct and the employment action . . . [makes] out a prima facie case"); *but see Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003) (stating that "chronological proximity does not by itself establish causality").[9]

---

[9] The close proximity between the time that plaintiff left work and the initiation of the investigation weighs less strongly in plaintiff's favor than it might under other circumstances. Here, plaintiff left the office on September 23, 2014, after Wiser voiced multiple complaints about his work practices. In fact, he left work directly following a meeting that was called for the purpose of discussing problems with his performance. He did not actually apply for FMLA leave until October 22, 2014, one month later. The fact that his termination followed the exercise of his FMLA rights helps establish a *prima facie* case, but is not strong evidence of an intent to retaliate under the circumstances.

Because plaintiff has made such a showing, the burden shifts to defendants to offer a legitimate, non-retaliatory reason for the termination. *Wright,* 352 F.3d at 478. Here, defendants contend that plaintiff was terminated for the reasons communicated in his termination notice, namely (1) neglect of duty, based on the hours plaintiff spent watching *Hogan's Heroes*, engaging in other non-work related computer activity, and making personal phone calls during work hours; (2) conduct unbecoming an employee, based on the advertisements for sexual services he viewed during work, and the messages for such services he sent and received using his town-issued cellular telephone and e-mail address; and (3) insubordination, based on his failure to comply with the Town Administrator's directives to attend investigatory interviews. Those stated reasons unquestionably constitute legitimate reasons for the termination.

The burden then shifts to plaintiff to offer proof that these reasons were "in fact a pretext for retaliating against him for having taken FMLA leave." *Hodgens*, 144 F.3d at 161. Plaintiff does not dispute the facts underlying the charges made against him. Instead, he contends that it was unfair for the Town to base its decision, in part, on the fact that he did not attend the investigatory interviews at a time when he believed he was under criminal investigation. Even if true, that is not evidence of pretext. Furthermore, and in any event, defendants have offered overwhelming evidence—none of which is controverted—that plaintiff spent virtually all day, every day watching television and viewing sexual services advertisements instead of performing his work. Plaintiff admits those allegations, and offers no affirmative evidence that defendants' stated reasons are merely a pretext for their true retaliatory intent. Defendants' motion for summary judgment as to Count Two will accordingly be granted.

> **2.    Counts Three and Four:  Massachusetts Small Necessities Leave Act Claims**

The Massachusetts Small Necessities Leave Act (SNLA) allows eligible employees to

take 24 hours of leave during any twelve-month period for the purpose of participating in school activities or accompanying children and elderly relatives to healthcare appointments. *See* Mass. Gen. Laws ch. 149, § 52D(b). The leave available to employees under the SNLA supplements the leave available under the FMLA. *See id*. The SNLA also explicitly incorporates FMLA provisions, including those related to eligibility, specifically including the requirement that an employee have been employed for at least twelve months before becoming eligible for SNLA leave. *See id.* § 52D(c); 29 U.S.C. § 2611(2)(A)(i).

Plaintiff began work with the Rowley Water Department on September 23, 2013. He contends that he took leave on September 2, 2014, pursuant to the SNLA, in order to accompany his mother to medical appointments. However, he was not eligible for SNLA leave as of that date, because he had admittedly not been employed by the Water Department for at least twelve months by the date the leave was taken. Furthermore, the September 2 leave did not involve a school activity, and he did not take his mother to a medical appointment. Therefore, defendants cannot be held liable for interfering with or retaliating against plaintiff's right to take leave pursuant to the SNLA, because plaintiff had no such right.[10] Accordingly, defendants' motion for summary judgment as to Counts Three and Four will be granted.

### 3.     Count Five:  Invasion of Privacy

Generously construed, the complaint alleges a claim for invasion of privacy under the Massachusetts Privacy Act. *See* Mass. Gen. Laws ch. 214, § 1B.[11] The Act provides, in relevant

---

[10] At oral argument, counsel for plaintiff conceded that Federico was not eligible for SNLA leave as of September 2, 2014.

[11] The complaint alleges what is apparently a claim for the common-law tort of invasion of privacy in Count Five. (Compl. ¶53-58). Massachusetts has never recognized a common-law cause of action for invasion of privacy. *See Alberts v. Devine,* 395 Mass. 59, 70 (Mass. 1985). The Court will accordingly review Count Five pursuant to the Massachusetts statute governing invasion of privacy claims. *See* Mass. Gen. Laws ch. 214, § 1B. Although the Court construes claims in the complaint liberally, plaintiff must at least "give the defendant fair notice of what the plaintiff's claim is and the grounds of support upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S.

part, that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." That part of the statute protects employees from disclosing facts of a "highly personal or intimate nature when there exists no legitimate, countervailing interest." *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 518 (1984). The Act is most frequently invoked in cases where the plaintiff alleges public disclosure of private facts, but a plaintiff may also claim unreasonable intrusion "upon the plaintiff's 'solitude' or 'seclusion.'" *Polay v. McMahon*, 468 Mass. 379, 382 (2014) (*quoting Ayash v. Dana-Farber Cancer Inst.,* 443 Mass. 367, 408 n. 16 (2005).

Notwithstanding the statute's use of the disjunctive term "or," courts interpreting the Act have determined that "[t]he intrusion must be both unreasonable, as well as either substantial or serious." *Walker v. Jackson*, 952 F. Supp. 2d 343, 353 (D. Mass. 2013). *See Polay* 468 Mass. at 383. The Privacy Act "was not intended to prohibit serious or substantial interferences which are reasonable or justified." *See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 518 (1991). Generally, whether an intrusion satisfies this standard constitutes a question of fact. *See Polay* 468 Mass. at 383. Factors to be considered in assessing whether there has been an intrusion that is unreasonable and substantial or serious, include "the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." *Id.*

### a.    <u>Town of Rowley</u>

Plaintiff's claim for invasion of privacy as to the Town of Rowley fails as a matter of law. Under the Massachusetts Tort Claims Act, municipalities cannot be held liable for the

---

544, 545 (2007). In briefing and at oral argument, plaintiff asserted claims under the Fourth Amendment related to the invasion of privacy claim. However, plaintiff has not alleged a Fourth Amendment claim, and the Court does not construe Count Five to encompass one.

intentional torts of their employees. *See* Mass. Gen. Laws ch. 258, § 10. Specifically, under the Massachusetts Tort Claims Act, "public employers, but not their employees, are immunized from suit for intentional torts including invasion of privacy." *Tivnan v. Registrar of Motor Vehicles*, 50 Mass. App. Ct. 96, 102 (2000) (citing *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 286 n. 9 (1985)). Accordingly, defendants' motion for summary judgment on Count Five will be granted as to the Town.

### b. Wiser

Plaintiff's claim for invasion of privacy as to defendant Wiser similarly fails. To establish a claim for public disclosure of private facts, the plaintiff must show that the defendant has not only obtained information, but has also disclosed it. *See Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 116 (1st Cir. 1988). Plaintiff contends that Wiser rummaged through his briefcase and took photographs of its contents. Wiser contests this characterization, admitting that that she took photographs of work-related materials contained in his open briefcase, but denying that she opened the briefcase or examined any of its contents. Although Wiser admits that she took photographs of papers contained in his briefcase, she contends (and plaintiff does not dispute) that she never displayed those photographs to anyone. Thus, plaintiff has not provided evidence to create a genuine issue that Wiser disclosed private facts to anyone.

Furthermore, plaintiff cannot establish a claim for unreasonable intrusion upon seclusion because he has not put forth any evidence to show that the claimed intrusion was both (1) unreasonable and (2) substantial or serious. *See Polay* 468 Mass. at 383. The alleged intrusion occurred at plaintiff's place of work, during the brief period that he stepped out of the office to use the restroom and clock in. Plaintiff does not allege that Wiser's actions were part of an ongoing pattern of invasion or harassment. *See Schlesinger*, 409 Mass. at 519. Although Wiser

used a camera to take photographs of the briefcase's contents, that did not constitute an unreasonable intrusion into plaintiff's seclusion; Wiser has consistently stated that she only captured photographs of work-related documents, and plaintiff has not produced any contrary evidence. *Cf. Polay*, 468 Mass. at 384 (finding defendants' use of film cameras exacerbate intrusiveness). In addition, all of the evidence in the record supports the conclusion that Wiser sought the information to determine whether plaintiff was taking work home in defiance of her orders. Under the circumstances, there is no genuine issue of material fact that Wiser's actions did not constitute an unreasonable and substantial or serious intrusion upon plaintiff's seclusion. Accordingly, defendants' motion for summary judgment on Count Five will be granted as to defendant Wiser.

### IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: December 7, 2016